IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. SHELBY


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

MARK V. SHELBY, APPELLANT.


Filed September 15, 2015.    No. A-15-094.


Appeal from the District Court for Lancaster County: STEVEN D. BURNS, Judge. Affirmed.

Joseph Nigro, Lancaster County Public Defender, and Paul E. Cooney for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.


MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

Mark V. Shelby was convicted of two counts of possession of a controlled substance in the district court for Lancaster County. On appeal, he challenges the district court's orders overruling (1) his motion to suppress evidence obtained during a warrantless search of his apartment and (2) his motion to suppress statements he made to police at the time of the search. He also challenges his sentences as excessive. For the following reasons, we affirm.

BACKGROUND

On February 14, 2014, the State filed an information charging Shelby with two counts of possession of a controlled substance, each a Class IV felony. Count I alleged possession of methamphetamine, and count II alleged possession of cocaine base.

Prior to trial, Shelby filed a motion to suppress evidence obtained during a warrantless search of his apartment. He alleged that the search did not fall under any recognized exception to the warrant requirement. He also filed a motion to suppress statements he made to police at the

time of the search. He alleged that the statements resulted from custodial interrogation that occurred before he was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

On July 21, 2014, the district court held a suppression hearing. Officer Anthony Gratz, the State's only witness, testified as follows. He was assigned as an investigator to the City of Lincoln/Lancaster County narcotics unit task force. On November 14, 2013, he and another officer were involved in an investigation at an apartment on South 11th Street in Lincoln, Nebraska. The officers received an anonymous tip from Crime Stoppers that methamphetamine was being sold out of a specific apartment at that address, and they learned that Shelby lived at the apartment. At around 7 p.m. on November 14, they knocked on the apartment's door, and a woman who identified herself as Barbara Schafer opened it. Schafer indicated that she resided at the apartment. The officers identified themselves and asked if Shelby was home. Schafer called for Shelby, whom the officers could see in the apartment's back bedroom, sitting in his wheelchair.

Gratz testified that Shelby entered the living room and that both Shelby and Schafer invited the officers into the apartment. They told Shelby and Schafer the details of their investigation and explained that their purpose was to ensure that no drug activity was occurring in the apartment. They asked for consent to search the apartment, and Shelby and Schafer said "[t]hat they would take [the officers] through the apartment and allow [them] to look." The officers indicated that they wanted to confirm that there were no drugs in the entire apartment. As all four individuals went through the apartment, the officers again asked for permission to look in each area that they searched, and permission was granted. At no point did Shelby or Schafer limit the search or revoke their consent.

The search began in the apartment's only bedroom. In a trash can in the bedroom, the officers found a small baggie containing what appeared to be marijuana. In a cardboard box containing women's socks and perfume, they found a 1- by 1-inch baggie with a residual amount of suspected methamphetamine. Schafer claimed ownership of the box but said that her brother (who was not Shelby) might have placed the baggie there. When searching a desk in the bedroom, the officers located a pill container with partially smoked marijuana cigars and a film canister containing razor blades with what appeared to be methamphetamine residue on them. While in the bedroom, Shelby admitted to trying methamphetamine and smoking marijuana recently.

Gratz testified that after completing their search of the bedroom, the officers searched the living room, kitchen, and bathroom. They also searched Shelby's wheelchair after asking him to exit it and sit on the living room couch. They uncovered no additional contraband during these searches.

According to Gratz, Schafer was then placed under arrest for possession of a controlled substance. Prior to being escorted out of the apartment, however, Schafer became increasingly nervous and began frantically asking for a beverage from the kitchen. Gratz agreed, and as he walked toward the kitchen, he turned and saw Schafer removing two pouches from her person and trying to conceal them behind her back. Gratz seized the pouches, which contained a crack pipe and a methamphetamine pipe. The pipes and the 1- by 1-inch baggie found in the bedroom field tested positive for the presence of methamphetamine and cocaine base.

Gratz testified that after Schafer was placed in a police cruiser, the officers began writing Shelby a citation for possession of marijuana. While writing the citation, they asked Shelby if the pipes recovered from Schafer were his or if he had used them. Initially, Shelby denied using the pipes. The officers then asked if his DNA or fingerprints would be found on the pipes, and Shelby said yes. He admitted to using the methamphetamine pipe earlier that day and using the crack pipe approximately two weeks earlier. According to Gratz, the officers did not make any promises to Shelby or use force or coercion to obtain the statements. Gratz further testified that at the time Shelby made the statements, they had not placed Shelby under arrest or given him *Miranda* warnings, and he was free to leave. Shelby did not appear to be under the influence of drugs.

On cross-examination, Gratz testified that he never sought or obtained a search warrant. He admitted that written consent-to-search forms were available to him at the police department, but he did not use them. According to Gratz, Shelby never asked the officers about the need for a search warrant, and neither officer told Shelby that a search warrant was not needed.

Gratz did not recall Shelby's or Schafer's exact words, but he did remember that they used their hands to wave the officers into the apartment. He also did not recall Shelby's or Schafer's exact words consenting to the search of the apartment. According to Gratz, after consenting to the search, Shelby and Schafer guided the officers to the back bedroom and granted them permission before they opened anything or looked in any drawer. Gratz testified that Shelby was cooperative and did not appear nervous.

After the State rested, Shelby testified as follows. Schafer did not reside at the apartment but stayed there occasionally. When the officers knocked on the door, Shelby had just gotten out of the bathtub and was getting dressed. When he entered the living room, the officers were already inside the threshold. He never invited the officers into the apartment. He asked the officers if they had a search warrant, and they said that they did not need one because they had probable cause. He never granted the officers permission to search the apartment.

According to Shelby, the officers told him to remove his shoes and his leg brace and to exit his wheelchair so they could search it. He felt that these were instructions, not requests, and that he had to comply. He did not feel free to leave, because "the search was on" and the officers were "just doing their thing."

Shelby testified that after the officers cited him for possession of marijuana, one of them told Shelby that he had "some sort of DNA set-up" in his car and that if he found Shelby's DNA on the pipes, he would come back and kick in the door. Shelby denied telling the officers that he had used the pipes.

On cross-examination, Shelby admitted that he never told the officers to stop looking around the apartment.

On August 14, 2014, the district court denied the motions to suppress in a written order. Regarding the motion to suppress evidence, the court found that although it was "true that Shelby did not invite the officers into the apartment," it was uncontested that Schafer did. The court found that the officers did not threaten anyone, "display a show of force or weapons," or conduct themselves in an oppressive manner. It found that Shelby and Schafer "agreed to have the officers look around the apartment."

The court then phrased the issue before it as whether, once the officers were lawfully in the apartment, they "discovered in plain sight sufficient evidence to mature their presence from a

consensual 'look around' to a probable cause search." The court found that neither Shelby nor Schafer "attempted to revoke their consent to a 'look around' or to otherwise limit the search." It found that to the extent the search "involved an expansion of the 'look around,'" it was justified by probable cause that developed during the "look around."

Regarding the motion to suppress statements, the court found that Shelby was not in custody at the time he made the statements and that he made them freely, voluntarily, and intelligently. In support of its finding, the court noted that Shelby moved freely around the apartment as he spoke to the officers; the conversation was in Shelby's home; there was no evidence of coercion, threat, or force; and the atmosphere was not police-dominated.

The matter proceeded to a stipulated bench trial. The State introduced exhibit 1, which contained Gratz' police reports, a property report of the items seized during the search, and a lab report showing that the seized items tested positive for methamphetamine and cocaine base. Shelby objected to the exhibit based on the arguments raised in his motions to suppress, and the court overruled the objection. The court found Shelby guilty of both counts of possession of a controlled substance.

Following a sentencing hearing on December 30, 2014, at which the district court heard argument from Shelby's attorney, the court sentenced Shelby to 1 to 3 years' imprisonment on each count, with credit for 4 days served. The court ordered the sentences to run concurrently with each other, but consecutive to any other sentence that Shelby was then serving. The record indicates that at the time of sentencing, Shelby was incarcerated for a parole violation. Shelby timely appeals to this court.

ASSIGNMENTS OF ERROR

Shelby assigns, restated, that the district court (1) erred in overruling his motion to suppress evidence, (2) erred in overruling his motion to suppress his statements to police, (3) erred in finding him guilty based upon inadmissible evidence, and (4) abused its discretion by imposing excessive sentences.

STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015). Regarding historical facts, we review the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *Id*.

In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, we apply a two-part standard of review. *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014). Regarding historical facts, we review the trial court's findings for clear error. *Id*. Whether those facts meet constitutional standards, however, is a question of law, which we review independently of the trial court's determination. *Id*.

We will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015).

ANALYSIS

*Motion to Suppress Evidence.*

Shelby maintains that it was error to overrule his motion to suppress evidence obtained during the warrantless search of his apartment. He argues that neither he nor Schafer freely and voluntarily consented to a search of the apartment. Rather, Shelby contends, he "merely submitted to the authority shown by the two officers." Brief for appellant at 18. He also maintains that when the officers were in the living room, which is the only place they had a right to be, they did not observe anything in plain view that justified a search of the apartment.

The State responds that the court properly overruled the motion to suppress because the officers never exceeded the scope of the consent to search, which was freely and voluntarily given.

It is well settled under the Fourth Amendment that warrantless searches and seizures are per se unreasonable, subject to a few specifically established and well-delineated exceptions. *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). The warrantless search exceptions recognized by the Nebraska Supreme Court include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest. *Wells, supra.*

To be effective under the Fourth Amendment, a consent to search must be a free and unconstrained choice, not the result of a will overborne. *Tucker, supra.* It must be voluntarily given and not the result of duress or coercion, whether express, implied, physical, or psychological. *Id.* In determining whether consent was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. *State v. Prahin*, 235 Neb. 409, 455 N.W.2d 554 (1990). Mere submission to authority is insufficient to establish consent to search. *Tucker, supra.* The determination of whether a consent to search is voluntarily given is a question of fact to be determined from the totality of the circumstances. *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997). The burden is on the State to prove that consent to search was voluntarily given. *Prahin, supra.*

Based on the evidence presented at the suppression hearing, the district court's finding that Shelby and Schafer consented to the officers' search of the apartment (or to the "look around" in the district court's words) was not clearly erroneous. After the officers lawfully entered the apartment at Schafer's invitation (and possibly Shelby's), the officers explained that they were investigating an anonymous tip from Crime Stoppers and that their purpose was to ensure that no drug activity was occurring in the apartment. They asked for consent to search the apartment, and Shelby and Schafer agreed to take the officers through the apartment and allow them to look around. As they walked through the apartment, the officers again asked for permission to look in each area that they searched, and permission was granted. Neither Shelby nor Schafer limited the search or revoked their consent.

Although Shelby denied consenting to the search, it was the district court's prerogative to give Gratz' testimony more weight, and it is not our role to reweigh the evidence or resolve conflicts in the evidence. *Ready, supra.* Rather, we recognize the district court as the finder of fact and take into consideration that it observed the witnesses. *Id.* Likewise, Gratz' inability to recall the exact words that Shelby and Schafer used to consent to the search, and the fact that no written

consent was obtained, were matters for the district court to weigh in ruling on the motion to suppress and do not render its decision clearly erroneous.

We note that the district court did not explicitly find that the consent to search was freely and voluntarily given. However, such a finding is implicit in the court's decision. See *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996) (finding that a necessary factual finding was implicit in the court's decision overruling a motion to suppress). The court found that the officers did not threaten anyone, "display a show of force or weapons," or conduct themselves in an oppressive manner. It further found that there was no evidence of coercion, threat, or force and that the atmosphere was not police-dominated. These findings show that the court did not view Shelby's and Schafer's actions as resulting from duress or coercion, or from mere submission to authority.

The district court's implicit finding that the consent to search was freely and voluntarily given is not clearly erroneous. The Nebraska Supreme Court has found that consent to search was voluntary and not mere submission to authority where officers repeatedly asked a suspect to enter his apartment to look for illegal items and threatened to get a search warrant, eventually leading the suspect to step back from the door with his arms raised and his hands upward and outward. *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). In Shelby's case, there was even less evidence of pressure from the officers, as there was no evidence of repeated requests for permission to enter and search the apartment or of threats to obtain a search warrant. Furthermore, Gratz testified that Shelby was cooperative and not nervous and did not appear to be under the influence of drugs. Contrary to Shelby's characterization of it, the evidence paints a picture of a cooperative and consensual encounter, with Shelby and Schafer guiding the officers through the apartment and the officers asking for and obtaining permission to search each new area. There is no indication that the officers took advantage of Shelby's "vulnerable state" of being confined in a wheelchair. Brief for appellant at 18.

We next address the scope of the consensual search. The district court referred to the search as a "look around" and held that to the extent the search "involved an expansion of the 'look around,'" it was justified by probable cause.

The Nebraska Supreme Court's recent decision in *City of Beatrice v. Meints*, 289 Neb. 558, 856 N.W.2d 410 (2014), precludes us from adopting the district court's specific reasoning. In *Meints*, the court clarified that probable cause by itself does not justify a warrantless search of real property. *Id*. Although probable cause in conjunction with other circumstances may justify a warrantless search under the "plain view" doctrine, *id*., there is no evidence that the items the officers seized in the bedroom were in plain view. Likewise, although probable cause is an element of the exigent circumstances exception to the search warrant requirement, see *State v. West*, 223 Neb. 241, 388 N.W.2d 823 (1986), the elements of that exception are not satisfied here. Instead of relying on probable cause in the manner that the district court did, we affirm its decision on slightly different grounds, with our focus placed on the scope of consent. See *State v. Marshall*, 269 Neb. 56, 690 N.W.2d 593 (2005) (where the record adequately demonstrates that the decision of a trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm).

The standard for measuring the scope of consent under the Fourth Amendment is objective reasonableness, that is, what the typical reasonable person would have understood by the exchange between the officer and the suspect. *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). Whether any limitations were placed on the consent given and whether the search conformed to those limitations is a question of fact to be determined by the totality of the circumstances. *Id*.

*Tucker, supra*, is instructive. The defendant in that case argued that he never consented to a thorough search of his apartment but, rather, consented to "letting the officers come inside and visually look around." *Id*. at 948, 636 N.W.2d at 860. The Nebraska Supreme Court rejected this argument, reasoning that the officers explained that they had reasonable suspicion to believe the defendant possessed illegal drugs and, therefore, the defendant should "reasonably have known that any request to search would be a request to have a closer look for illegal drugs and drug paraphernalia rather than a simple visual scan around the apartment." *Id*. at 949, 636 N.W.2d at 861. The court further noted that the defendant should reasonably have known that any request to search would have included looking for illegal drugs in closed drawers or cabinets, where such items could be hidden. *Id*.

The court in *Tucker, supra*, relied on *U.S. v. Coffman*, 148 F.3d 952 (8th Cir. 1998), in which, after observing an empty handgun holster on a chair, an officer asked the defendant if there were any weapons in the house. The defendant replied, "'Go ahead and look around. You won't find a thing.'" *Id.* at 953. The Eighth Circuit affirmed the denial of the defendant's motion to suppress drug evidence located under his bed in the resulting search, reasoning that a reasonable person would not have understood the defendant to be permitting only a limited search of the home. *Id*. at 953.

Here, the officers explained that they were investigating a Crime Stoppers' tip and that they wanted to confirm that there were no drugs in the entire apartment. According to Gratz, after the officers asked for consent to search the apartment, Shelby and Schafer said "[t]hat they would take [the officers] through the apartment and allow [them] to look." As in *Tucker, supra*, and *Coffman, supra*, a reasonable person under the circumstances would not have understood this as permission to conduct a limited visual scan of the apartment, but as permission to search for illegal drugs in the places they could be hidden. This conclusion is supported by the fact that, as Shelby and Schafer guided the officers through the apartment, they did not revoke their consent to search or place any limitations on the consent given. Instead, they granted permission each time the officers asked to search a new area. On cross-examination, Gratz even clarified that the officers asked for and obtained permission before they opened anything or looked in any drawer. Based on this evidence, the district court properly overruled the motion to suppress evidence obtained during the warrantless, but consensual, search of Shelby's apartment.

*Motion to Suppress Statements*.

Shelby argues that the district court erred in overruling his motion to suppress the statements he made to police prior to being advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He maintains that his statements were products of custodial interrogation.

*Miranda, supra*, prohibits the use of statements stemming from a defendant's custodial interrogation unless the prosecution demonstrates the use of procedural safeguards effective to

secure the privilege against self-incrimination. *State v. McKinney*, 273 Neb. 346, 730 N.W.2d 74 (2007). *Miranda* protections apply only when a person is both in custody and subject to interrogation. *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014). A person is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest. *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011). Two inquiries are essential to this determination: (1) an assessment of the circumstances surrounding the interrogation and (2) whether, given those circumstances, a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

The Nebraska Supreme court, quoting *U.S. v. Axsom*, 289 F.3d 496 (8th Cir. 2002), has applied "'six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation.'" *State v. Mata*, 266 Neb. 668, 682, 668 N.W.2d 448, 466 (2003), *abrogated on other grounds*, *State v. Rogers, supra*. Those indicia are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong-arm tactics or deceptive stratagems were used during questioning; (5) whether the atmosphere of the questioning was police dominated; and (6) whether the suspect was placed under arrest at the termination of the proceeding. *State v. C.H.*, 277 Neb. 565, 763 N.W.2d 708 (2009).

The Nebraska Supreme Court has also identified other circumstances relevant to the custody inquiry: (1) the location of the interrogation and whether it was a place where the defendant would normally feel free to leave; (2) whether the contact was initiated by police or by the person interrogated, and, if by the police, whether the defendant voluntarily agreed to the interview; (3) whether the defendant was told he or she was free to terminate the interview and leave at any time; (4) whether there were restrictions on the defendant's freedom of movement during the interrogation; (5) whether neutral parties were present at any time during the interrogation; (6) the duration of the interrogation; (7) whether the police verbally dominated the questioning, were aggressive, were confrontational, were accusatory, threatened the defendant, or used other interrogation techniques to pressure the suspect; and (8) whether the police manifested to the defendant a belief that he or she was culpable and that they had the evidence to prove it. *State v. Rogers, supra*.

Although some of the circumstances surrounding the making of the statements could tend to support a contrary finding, we conclude that the district court's finding that Shelby was not in custody at the time he made the statements was not clearly erroneous. Supporting the district court's finding is the consideration that Shelby was in his own apartment and not at the police station or in an unfamiliar environment. See 2 Wayne R. LaFave et al., Criminal Procedure § 6.6(e) (3d ed. 2007) (noting that courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings). Likewise, the officers did not physically restrain Shelby, and there is no indication that Shelby was not free to ask the officers to leave. See *State v. Brown*, 225 Neb. 418, 405 N.W.2d 600 (1987) (holding that a suspect was not in custody for purposes of *Miranda* when an officer questioned him in his trailer home and the

suspect was never physically restrained and was free to depart from the trailer home or to request that the officer leave the premises).

The circumstances of Shelby's case are distinguishable from the circumstances of *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994), which also involved in-home questioning. In *Dyer*, an officer responded to a call that a woman was suffering a medical emergency. The woman was escorted from the home in an ambulance, and the officer remained at the home for another 1½ hours questioning the woman's husband, even arranging for a third party to watch the couple's children. When the woman's husband said he wanted to go to bed and began walking to his bedroom, the officer blocked the man's path by standing in the hallway, and then talked him into sitting back down. During the questioning, the man admitted to assaulting his wife. The court found that the man was in custody for purposes of *Miranda*.

Shelby contends that "his freedom of movement was seriously restricted as he was in a wheelchair." Brief for appellant at 21. He notes that he could not exit his garden-level apartment without another person's assistance and that he was still sitting on the living room couch at the time the officers asked him about using the pipes. While Shelby's physical disability may have limited his mobility, nothing in the record indicates that the officers intentionally used his disability as a means to detain him during questioning. The officers did nothing comparable to blocking Shelby from moving to another area of the apartment, like the officer in *Dyer, supra*. Although Shelby may have been sitting on the living room couch when questioned about the pipes, nothing suggests that he could not have either returned to his wheelchair and exited the living room or requested that the officers leave.

We recognize that Shelby testified that he did not feel free to leave, but his explanation for feeling this way was not based on anything the officers said to him or any action they directed toward him. Instead, Shelby explained that he did not feel free to leave because "the search was on" and the officers were "just doing their thing." Even if the officers had briefly detained Shelby during their search of the apartment, this likely would not have risen to the level of custody for purposes of *Miranda*. See *United States v. Hernandez-Hernandez*, 327 F.3d 703 (8th Cir. 2003) (holding that INS agents' brief detention of a suspect during a consensual search of the suspect's home did not rise to the level of custody for purposes of *Miranda*).

Furthermore, as the district court found, there was no evidence that the officers used coercion, threats, or force to obtain the statements. Again, the evidence suggested that the interaction was consensual and that Shelby was cooperative and not nervous. The officers did not engage in a lengthy or high-pressure interrogation of Shelby. Rather, according to Gratz, after Shelby initially denied using the pipes, the officers asked if his DNA or fingerprints would be found on them, which elicited a positive response. Gratz testified that Shelby was not in custody and was free to leave at the time he made the statements. Although Shelby testified that the officers threatened to kick in the door if they located his DNA on the pipes, this was self-serving testimony that the court was entitled to discount in weighing the evidence.

It is worth noting that the tenor of the interaction may have changed to some degree once the officers arrested Schafer, and also once they began citing Shelby for possession of marijuana. However, Shelby does not argue that these circumstances have any impact on the issue of whether he was in custody for purposes of *Miranda*, and they do not alter our analysis. We conclude that

the district court's finding that Shelby was not in custody was not clearly erroneous and that the district court properly denied Shelby's motion to suppress his statements to police.

*Sufficiency of Evidence.*

Shelby argues that the district court erred in finding him guilty based upon inadmissible evidence. He notes that the only evidence at trial was the State's exhibit 1, which included information about the evidence seized during the warrantless search and about Shelby's pre-*Miranda* statements to police.

Shelby's argument regarding the sufficiency of the evidence is dependent upon his arguments in support of his motions to suppress, which we have rejected. Because the district court properly denied the motions to suppress, it did not err in finding Shelby guilty based on the evidence and statements that Shelby challenged in those motions. Shelby does not contend that the evidence, if properly admitted, was insufficient to convict.

*Excessiveness of Sentences.*

Shelby's final argument is that the district court abused its discretion by imposing excessive sentences. Factors a judge should consider in imposing a sentence include the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011).

The presentence investigation report indicates that Shelby was 61 years old on the date of the offense. He was a foster child and contracted polio at age 3, permanently disabling him and requiring him to use a wheelchair or crutches. He graduated from high school and attended some community college classes. His criminal record is extensive, beginning with burglary and petty larceny offenses as a juvenile. His adult criminal record spans from 1972 to the present case and includes convictions for delivery of a controlled substance (6 convictions), possession of marijuana (8 convictions), possession of drug paraphernalia (5 convictions), driving without an operator's license (5 convictions), and a number of other offenses. The most serious convictions were for two counts of delivery of a controlled substance with habitual criminal enhancements, for which Shelby received consecutive sentences of 10 to 25 years' imprisonment in 1992. He was on parole from these convictions when he committed the offenses in this case. The record reflects that Shelby reached an agreement with the State in this case to avoid the habitual criminal enhancement in exchange for proceeding with a stipulated bench trial. The presentence investigation report indicated that Shelby was "very high risk" for recidivism.

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Williams*, *supra.* And it is the minimum portion of an indeterminate sentence which measures its severity. *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990). Shelby was convicted of two counts of possession of a controlled substance, each a Class IV felony punishable by up to 5 years' imprisonment, a $10,000 fine, or both. Neb. Rev. Stat. §§ 28-105(1), 28-416(3) (Cum. Supp. 2014). He was sentenced to 1 to 3 years' imprisonment on each count, with credit for 4 days served. The court ordered the sentences to run concurrently with each other, but consecutive to any other sentence. Shelby's sentences are on the low end of

the permissible sentencing range. Having considered the relevant factors in this case, we find that the sentences are not excessive or an abuse of discretion and affirm such sentences.

## CONCLUSION

For the reasons stated above, we affirm Shelby's convictions and sentences.

AFFIRMED.